Good morning, everyone, and welcome to the Ninth Circuit. Judge Pius and I want to thank and welcome Judge Seaborg, who kind of has a busy job in the Northern District of California, so we appreciate you making the trip and helping us out. Thank you very much. We've got three matters for argument today. I always say this, like I say, no extra credit in the Ninth Circuit for using all of your time. If you've made your points and you're not getting any questions back, it's okay to sit down. And with that, we'll call the first matter, which is Schwartz v. Miller. Good morning, Your Honors, and may it please the Court. Joshua Wesneski on behalf of the appellant, Paul Schwartz. I'd like to reserve three minutes for rebuttal. Sure. Developments in this Court's precedent since the filing of the appeal have provided a clear path to reversal in this case. Most crucially, in Watanabe v. Durr, this Court held that the existence of an alternative remedial mechanism is a Bivens Step 2 issue, and in Chambers v. Herrera, the Court described the PLRA and the grievance procedures thereunder as an alternative remedial structure. The District Court's decision applying the PLRA at Bivens Step 1 and declaring a Bivens remedy categorically unavailable to all federal prisoners cannot be reconciled with that now-binding precedent. Additionally, Watanabe and other recent cases do away with the appellee's alternative argument based on alleged differences between this case and Carlson v. Green in terms of severity or immediacy. In Watanabe, Stenard v. Dye, and Hurst v. Durr, this Court has recently and repeatedly confirmed that those differences go to the existence of a constitutional violation, not to the availability of a Bivens remedy. In any event, the facts here are much more akin to those in Carlson. The District Court's decision was wrong, and the appellee's defense of it misguided. The judgment should be reversed, and Mr. Schwartz should be given the opportunity to amend his complaint, as this Court strongly indicated in its prior order. The District Court's decision here was focused on the PLRA, so I'd like to start there, and I believe that Watanabe shuts the door on that argument entirely. The government there argued that the deliberate indifference claim alleged by the plaintiff arose in a different context because the plaintiff there had access to the ARP, the Administrative Review Process, available to federal prisoners. This Court rejected that contention unequivocally, saying that in Egbert, the Supreme Court clarified that the existence of alternative remedial structures can be one special factor to be considered as the second step of the Bivens analysis, but that the Court was not required to undertake that second step because Watanabe's case was not meaningfully different from Carlson. And we brought this intervening precedent to the attention of the Court, and the appellee's response principally was that Watanabe did not address the PLRA. But the Court was clear that alternative remedial structures go to step two, and this Court and Chambers, when addressing the PLRA at step two, as virtually every Court has done, stated that the Prison Litigation Reform Act ultimately provides the plaintiff there the remedies available to him by Congress. And in that same discussion, the Court concluded — You know, if I remember correctly, the primary points at dispute in Watanabe were the severity and nature of the action, and the alternative remedies came sort of at the end, if I remember correctly. That's accurate, Your Honor. The principal point of discussion in the briefs and at oral argument, as I'm sure you recall, was based on the severity or the immediacy. But the existence of alternative remedies was an issue raised by counsel there. They focused — they raised the issue of the administrative remedies, if I remember correctly. They did, Your Honor. But actually, at oral argument, government counsel also raised the PLRA in an exchange with Judge Milan-Smith about how the PLRA signified Congress's intent not to allow Bivens' claims and that that should be considered at step one. Again, as the Court may recall, there was no dispute that if they reached step two, the claim was not going to be allowed. So the government counsel there raised the PLRA. There was an exchange with Judge Milan-Smith about its significance there. But notably, Judge Milan-Smith, even though he dissented in part, did not cite the PLRA or the ARP as factors at step one that should have distinguished the case from Carlson v. Green. His concern was the nature and severity. That's right, Your Honor. And I would say even as to those points, obviously, Judge Milan-Smith's perspective didn't carry the day. But even if it had, I think his objections there in Watanabe would not even apply here. We actually have here, I think, comparable severity. Obviously, Mr. Schwartz didn't die, but he does suffer now from stage three kidney failure, Graves' disease, serious, repeated, life-threatening emergencies, thyroid storms, the kind of stuff that really Carlson v. Green is very much concerned with, and the severity of the mistreatment. We have not just a delay in treatment, which, of course, was also present in Carlson v. Green, but also obstruction of treatment by failing to record his visits or deleting his name from the sick call, and I think demonstrably inadequate treatment. For example, the recommendation when he was presenting with life-threatening symptoms to simply drink more water and exercise. Let me ask you this. Do you think that Ziegler in any way helps answer this question? I think, Your Honor, that's a great point, and I think it answers it almost precisely, which is to say the Court in Ziegler, when it talked about the PLRA, made the point that when Congress was passing the PLRA, it did so against the backdrop of Bivens and Carlson and understood that this — that the Supreme Court had provided for remedies in those circumstances. And what the Supreme Court said about the PLRA was that it could be construed as a congressional decision not to extend those existing remedies in Bivens and Davis and Carlson to other circumstances of mistreatment or constitutional violations against Federal prisoners. But the negative implication there is that Congress did not overrule the existing claims for relief that were recognized by the Supreme Court. Consideration of that in the Ziegler case at step one, as opposed to step two. I don't think it was clear, Your Honor, respectfully, at what step the Supreme Court was addressing it. And in fact, on remand, the District Court construed the Supreme Court's decision as putting the PLRA at step two and not at step one. And again, I think — I think that's reflected in what the Court actually said about what the PLRA did, which is that it doesn't — that it counsels against further extension of Bivens. That was the context of the conversation. Of course, that's a step two question, not a step one question. Just to close the loop on Watanabe, I'll also add that Watanabe also makes clear that if the precedent of this Court recognizes a Bivens claim in a given context, a specific future defendant comes up with a new argument for why there shouldn't be a Bivens claim. So the plaintiff in Watanabe, the plaintiff in Stenard, the plaintiff in Hearst, they all had access to the ARP. They were all governed by the PLRA. The fact that the defendants there didn't raise the PLRA specifically doesn't make that precedent any less binding as to the central issue of whether there is a recognized and viable Bivens claim in virtually identical circumstances or, I would argue, more — Let me ask you this. The mandate is not issued in Watanabe, because the government asked for an extension — That's correct, Your Honor. — to consider whether or not it wanted to file a petition for re-hearing, re-hearing on Bach. Do you think we should just wait to see what happens with Watanabe? I don't, Your Honor, for the reason I mentioned a moment ago, which is that even if you take Judge Myland-Smith's view of the law from his partial dissent, he didn't suggest or argue that the ARP or the PLRA were special factors at step one that should result in the dismissal of the claim. And even the points that he did find distinction on I don't think are even present here. We don't have the same issue with the severity of the injury or the severity of the remedy. So the only way that Watanabe would affect this case is if the Ninth Circuit went further, even than what Judge Myland-Smith suggested in his partial dissent, they should go. Now, of course, there's always the possibility that the full en banc Ninth Circuit is going to overturn its existing precedent, and there are always parties in front of the en banc Ninth Circuit asking it to do just that. But I don't think we ought to hold this case out based on the possibility that the en banc court may deviate from its existing precedent, not just Watanabe, I would add, but also Stenard, I think. They deviate from both of those cases and go and issue a ruling that actually would reach the facts of this case, which, again, we think are much closer to Carlson v. Green than even Stenard or Watanabe. As the Court may recall, Watanabe was about a broken coccyx. Stenard was about hepatitis C, which eventually was cured and resolved entirely. Mr. Schwartz's injuries are about, as I said, stage three kidney failure, chronic, life-threatening, lifelong conditions that he is still struggling with today and is still facing the effects of today. Let me ask you this. Has any other circuit adopted the government's position in this case? There is a recent Eleventh Circuit decision, Terry v. Johnson, I believe, is the citation. And it did treat the ARP as a step one consideration in a case where the plaintiff there had alleged a medical deliberate indifference claim. That came out, I think, in the last month or so. I don't know whether there's going to be a petition for rehearing there, a petition for certiorari. So there is a possibility that a circuit split emerges on this, but as the law stands in the Ninth Circuit now, today, the rule in this Court is that the ARP and the PLRA are step two considerations. In this, I haven't read this Terry v. Johnson case, but so I gather what you're telling us is that in Terry, the Eleventh Circuit, the panel, the panel decision? The panel in your office. Said that at step one, the PLRA was a factor. It was just the administrative review procedure. I don't think it actually talked about the PLRA specifically. The case there, I'm sorry, I got it backwards. It's Johnson v. Terry. Johnson v. Johnson. But yes, the ARP was something, and it used the same sort of rationale here that the district court did here, although I'll add it actually, I think, went a little bit further than the district court here, because what the court there said was, not only did Carlson v. Green not consider the ARP, but Carlson v. Green was decided under the old framework of how the Supreme Court evaluated Bivens claims and not the new sort of modern understanding of the idea that Congress may provide an alternative that is not as adequate, but that is still foreclosing a new Bivens claim. So my read of the case is that the Eleventh Circuit is actually saying that Carlson v. Green can't be relied on at all for any purposes because it was decided under the wrong rubric, which I do think, consistent with our arguments here, is beyond the power of the lower courts to decide. So I think even in that respect, not only do I think it misinterprets existing Supreme Court precedent, I think it also goes further than lower courts are permitted to go with respect to Supreme Court precedent. But we will see if there's a petition for rehearing there that was decided just about a month ago. So it should be coming up soon. There may be, again, a petition for certiorari. Okay, thank you. Do I reserve? Yes, Your Honor. Thank you. Good morning, and may it please the Court. Sarah Margolis on behalf of Ms. Tetodd. Under Egbert and Ziegler, this case presents a new context. That is, it's meaningfully distinct from the Supreme Court's trilogy of Vivens cases in multiple ways. The PLRA renders this case a new context for two reasons. First, even apart from the issue of alternative remedies, the PLRA tells us Congress's view of appropriate remedies in prisoner suits. Second, as this Court and the Supreme Court have both already held, alternative remedial structures can render a context new at step one of Egbert's test. That is, alternative remedial structures can make a meaningful difference and create a new context. The PLRA is one such alternative remedial structure. Turning to the first point — Doesn't the PLRA contemplate Vivens' actions in this context going forward? No, Your Honor, it doesn't. The PLRA made clear that it was intending to curtail prisoner litigation. And there's other types of prisoner litigation that it was intending to speak to. Section 1983 claims, for example, FTCA claims, for example. It does absolutely nothing to ratify Vivens or suggest that Congress wanted a Vivens remedy going forward. You know, PLRA, it does limit prisoner litigation. It does. They have to go through the administrative process. They have a screening. The district courts have a screening function they have to undertake, which is tantamount to a 12B6, do they state a claim? So the PLRA does provide that limitation on claims. But it doesn't — you know, if you look at the PLRA, it doesn't eliminate a — it doesn't say, you know, we're — we're getting rid of — there's no damages for certain kinds of claims. It doesn't say that at all. It just presides — it presents these procedural steps. You're correct, Your Honor. The PLRA doesn't say we're doing away with Vivens' claims, but it doesn't say anything at all about Vivens' claims. It doesn't ratify them. Well, what did the court — what was the court saying in Ziegler? So this is a — this is an excellent question, and I do want to make this very clear. So in Ziegler, the PLRA — the court considered the PLRA in two places. The principal one that I want to discuss here is with respect to the prisoner abuse claims against MDC's warden, Mr. Hastie. There, the court found that at Step 1, those prisoner abuse claims could not proceed. The court here is only doing a Step 1 analysis. It's not doing a Step 2 analysis. So it's only considering when it discusses the PLRA, makes clear that it's at Step 1. And it says, this case has certain features that were not considered in the court's prior Vivens' cases. The existence of an alternative remedy precludes a court from authorizing a Vivens'  Further, legislative action like the PLRA suggesting Congress does not want to damage its remedy is itself a special-factor counseling hesitation. Fifteen years after Carlson was decided, the court passed the PL — Congress passed the PLRA, which made comprehensive changes to the way prisoner abuse claims must be brought. So it seems clear that Congress had occasion to consider the proper way to remedy prisoner mistreatment, and it declined to extend a damage remedy against Federal correction officers. That is what Ziegler said. Sotomayor, do you think the court was just simply acknowledging that Carlson just dealt with a medical indifference case, wasn't dealing with abuse? So to the extent that I understand your question correctly, in Ziegler, in this passage, the court was not dealing with an Eighth Amendment-delivered indifference claim. But the question it was asking is whether something meaningful has changed since Carlson. It found that the PLRA was something meaningful that had changed since Carlson. That something meaningful rendered the context new there. That same something meaningful is present here. It has to render the context new here as well. That's quite a step. So in your view, the PLRA wipes out all medical indifferent — deliberate indifference cases. They're gone. That's correct. They're gone. And the district court — the district court said, you know, the district court was troubled with that and said, you know, this is — this is — this is not — you know, he was concerned about that. And he said there needs to be some clarity on this. You know, Your Honor — He was troubled by that. Sometimes over time, precedents lose some or all of their scope or — But don't you think we ought to wait to see what the Supreme Court says? They haven't — they haven't said this clearly. I think the Supreme Court has given enough guidance that compels us to go here. The Supreme Court has clearly said the PLRA is a consideration at step one. It rendered the context new there. The court in Egbert has said the question is whether Congress or the judiciary is better positioned to provide a remedy. Here, Congress considered whether to provide this remedy in the PLRA, and they decided not to. And I think that makes it very clear. So we would effectively be overruling Carlson? We would not be overruling Carlson, Your Honor. Carlson, the Supreme Court has made clear that it remains good law. It still stands. But what has happened is that — and it's happened sometimes in other contexts, too — precedents lose their force over time because intervening events occur. Another example of this is the Supreme Court's case in Davis. Davis, the second Bivens case, is still good law, but it really doesn't have any scope anymore because Congress has since passed the Congressional Accountability Act of 1995, which deals with discrimination by members of Congress against its employees. And their district courts have now recognized that that means Davis has no scope anymore. Intervening events come along and can reduce the scope or the practical import of prior precedents. That's exactly what has happened. Don't you think, if we were to credit your notion that Congress and the PLRA has made such a sweeping change to wipe out medical indifference claims under Bivens, don't you think we should look for a more explicit indication of that? The PLRA does not do that, doesn't say that. So why do you interpret the PLRA as being this intervening congressional action that has this effect? I think the Supreme Court has already told us that. So again, going back to the prisoner mistreatment claims against Ward and Hastie, the Supreme Court said there Congress's silence in passing the PLRA and not extending a damages remedy against Federal correction officers speaks volumes. It's telling. This isn't just a case where — Is there any legislative history that you could point to on this? So there is very little legislative history that suggests that Congress was thinking about Bivens when it passed the PLRA. But what the legislative history shows is that Congress was trying to curtail prison litigation. It was trying to get the district courts out of the operation of Federal prisons. They did that by the procedural mechanisms. I'm sorry? It did that by the procedural mechanisms that we discussed just a moment ago. But that certainly doesn't suggest that Congress wanted there to be a damages remedy against Federal officers. But they certainly knew about Bivens, a medical indifference claim. They knew about Carlson. But they certainly didn't ratify it, right? They didn't say, we're ratifying it at all. No, they didn't say we're wiping it out either. They didn't say we're wiping it out. I didn't say anything. They didn't say anything, Your Honor. But what they did was they put what prisoners can do in a smaller box. And so if anything, that goes to show that they wanted fewer remedies. And that is a meaningful difference that the Supreme Court did not get to consider in Carlson. And Ziegler and Egbert, regardless of whether we think what the PLRA said exactly about ratification or not ratification, the question is whether it is a meaningful difference from Carlson that gives us a single reason to hesitate before extending a Bivens remedy in this context. It clearly, plainly does. I want to just move to the second argument, which is a little bit different than was discussed before. So this case presents a new context for yet another reason. The inmate here had non-damages judicial remedies available to him. This is not about the severity of the mistreatment. It's not about the nature of the mistreatment. It's about the fact that it was not damages or nothing for Mr. Schwartz. In other words, again, wholly apart from the severity of the mistreatment, the fact that the inmate had time to and could seek prospective relief in court renders this context new. In both Bivens and Davis — You mean like an injunction? Correct, exactly. So in both Bivens and Davis, the Supreme Court remarked that for the plaintiffs in Bivens and Davis, it was damages under Bivens or nothing. In Ziegler, the Court reiterated, it is of central importance, too, that this is not a case like Bivens or Davis in which its damages are nothing. In Ziegler specifically, the availability of prospective judicial relief, like an injunction, Your Honor, created a new context. It precluded a Bivens remedy. Also, in Malesko, the Supreme Court remarked on the importance of this particular factor, saying, Respondent in Malesko is not a plaintiff in search of a remedy, as in Bivens and Davis. None of these courts' prior cases have considered whether the availability of prospective judicial relief creates a new context. In both Watanabe and Synard, the Court considered whether the severity of an inmate's injury was a meaningful difference. There are innumerable ways that the availability of prospective judicial relief might shift the cost-benefit balance. So in Watanabe, they — he had tried to seek an injunction. You're correct, Your Honor. And it didn't — he didn't know really what he was doing to get an injunction. But the government didn't — if I remember correctly, the government didn't argue that that was a new — that created a new context. And that was — I didn't hear that. I don't recall that argument. Maybe — maybe it was — it was there, and I just — it just didn't register with me. That's correct, Your Honor. In that case, the government did not argue that the damages-or-nothing nature of the case, the fact that he could get an injunction, presented a new context. This is a new argument that we are making here. And the fact that he could have got — the fact that Watanabe did ask for an injunction doesn't mean that you decided in that case that the availability of an injunction did not render the case a new context. You didn't consider it there. You didn't decide it there. So we are bringing this argument for the first time here. And the reason why I think this argument is so important is that the Supreme Court remarked in Ziegler that the availability of alternative judicial remedies might — is important to consider because those might be less intrusive on the other branches. Those might be faster. In this case, Mr. Schwartz, actually, after he left FCI Tucson, did seek an injunction. One month later, he withdrew the motion for an injunction because he said that he had been taken to the hospital and it had been resolved. That would have been something available for him to do. And the question is whether his ability to seek an injunction, unlike the inmate in Carlson who died right away, he clearly could not have come to court and said, please treat me differently. But Mr. Schwartz could. Is that a meaningful difference? Would that alter the cost-benefit analysis of creating a remedy here? Could a rational legislature, legislator, think that that alters the cost-benefit analysis? The answer is yes, and so that also creates a new context. If there is nothing further. Thank you, counsel. Thank you, your honors. Brief rebuttal. I wanted to complete the quote in Ziegler that my colleague was reading out to the court. That paragraph ends with, the act itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to extend the Carlson damages remedy to cases involving other types of prisoner mistreatment. This is not a case involving other types of prisoner mistreatment. The other point I will make just briefly with respect to the second argument that was raised, of course, we've made the point in our papers that coming up with a new argument that the other plaintiffs, the other defendants didn't think of isn't enough. But even in Watanabe, the court addressed that failure to respond to an incarcerated individual's serious medical need, even if that need is not technically life-threatening, can constitute deliberate indifference in violation of the Eighth Amendment. So while this precise argument was not raised there, I think the principle was rejected. And I would close just by saying that, in fact, for Mr. Schwartz, it is damages or nothing. Not only did he have a chronic condition that was not treated over time, but he also suffered from immediate emergent life-threatening thyroid storms, which are detailed in his complaint, that were not treated in that moment. It doesn't matter if he died from them or not. They were serious, they caused serious medical injury, and he was not treated at the time, along with all the other forms of deliberate indifference that he incurred. So respectfully, we would ask that this court reverse and allow Mr. Schwartz to proceed to trial. Could you just comment on the leave to amend issue, just very briefly? Yes, Your Honor. I think what I'll say about that, just briefly, is that we have no objection to once Mr. Schwartz is given an opportunity to amend, if those defendants are served, they can raise any statute of limitation argument that they want to raise about how they didn't have notice. I think it's going to be hard for them to make those arguments. But as we stand here, this court, I think, was very clear that if Mr. Schwartz filed a motion for leave to amend and included in that amendment the facts that were developed in discovery, which he did, that he should be permitted to file that amended complaint. And then those defendants can file whatever motions, 12B6, 12C, Rule 56 motions that they would like to file, and the court will have to decide those on their own merits. All right, thank you to both counsel for the fine advocacy in this case. We really appreciate stepping up pro bono and flying all this way to do it, and flying from New York as well. Also, Ms. Margolis, the very first case I ever had was with Judge Brissetti when he was a lawyer. So, anyway, this matter is submitted. We'll move on to the next one.
judges: PAEZ, OWENS, Seeborg